dismiss. We find there was sufficient evidence to support the jury's verdict, and the trial court did not abuse its discretion in imposing sentences within the statutory limits. We find the record is insufficient to determine whether counsel's failure to maintain a continuing objection to the inflammatory statement constituted ineffective assistance of counsel. We find the record is also insufficient to determine whether Glazebrook received ineffective assistance of counsel with regard to the witnesses called to testify at trial.

AFFIRMED.

———————————

State of Nebraska, appellee, v.
Betty Kellogg, appellant.
___ N.W.2d ___

Filed January 6, 2015.    No. A-14-038.

1. **Investigative Stops: Motor Vehicles: Probable Cause.** A traffic violation, no matter how minor, creates probable cause to stop the driver of the vehicle.
2. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs.** Once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. This investigation may include asking the driver for an operator's license and registration, requesting that the driver sit in the patrol car, and asking the driver about the purpose and destination of his or her travel. Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been stolen and whether there are outstanding warrants for any of its occupants.
3. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Probable Cause.** To expand the scope of a traffic stop and continue to detain the motorist, an officer must have reasonable, articulable suspicion that a person in the vehicle is involved in criminal activity beyond that which initially justified the interference.
4. **Probable Cause: Words and Phrases.** Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause.
5. **Police Officers and Sheriffs: Probable Cause.** Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances.
6. **Probable Cause.** Reasonable suspicion must be determined on a case-by-case basis.

7. **Constitutional Law: Search and Seizure: Arrests: Probable Cause.** The Fourth Amendment mandates that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.

8. **Probable Cause: Words and Phrases.** Probable cause is a flexible, common-sense standard that depends on the totality of the circumstances.

9. **Probable Cause: Appeal and Error.** An appellate court determines whether probable cause existed under an objective standard of reasonableness, given the known facts and circumstances.

Appeal from the District Court for Burt County: John E. Samson, Judge. Affirmed.

Nicholas E. Wurth, of Law Offices of Nicholas E. Wurth, P.C., for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

Moore, Chief Judge, and Irwin and Pirtle, Judges.

Per Curiam.

## I. INTRODUCTION

Betty Kellogg appeals her conviction for possession of methamphetamine, which charge arose out of a traffic stop. On appeal, she challenges the finding of the district court for Burt County, Nebraska, that the law enforcement officer who stopped her vehicle for speeding had reasonable suspicion to expand the stop beyond the purposes of the initial traffic stop and that there was probable cause to arrest her. We find no merit to these assertions, and we affirm.

## II. BACKGROUND

The events giving rise to this incident occurred on or about June 12, 2012. On that date, Nebraska State Patrol Trooper Jason Morris observed a vehicle driven by Kellogg passing another vehicle and traveling at 73 miles per hour in an area where the posted speed limit was 60 miles per hour. Trooper Morris conducted a traffic stop. He testified that the only basis for the traffic stop was that Kellogg was speeding.

Trooper Morris testified that when he asked Kellogg to produce her operator's license and registration, Kellogg was unable to produce her license. He testified that she went "past

her driver's license several times while she was looking for it" in her wallet. He testified that he observed her operator's license several times as she looked through items in her wallet, but did not point it out to her; Kellogg indicated to Trooper Morris that she "must have left it at home" and never did produce the license. Trooper Morris obtained Kellogg's license from her wallet after subsequently placing her under arrest.

Trooper Morris described Kellogg's demeanor at the time of the traffic stop as "appear[ing] to be confused, overactive, and unable to concentrate on the task [of providing her license and registration]," and he said that she "couldn't concentrate [and] couldn't sit still, she had gone past her driver's license several times while she was looking for it." He testified that her demeanor gave rise to suspicions that she was under the influence of a chemical substance. He testified that he did not detect the odor of alcohol or drugs and that Kellogg's speech was not slurred.

Trooper Morris asked Kellogg if she had been drinking or taking any drugs, and she indicated "that she was not currently drinking any alcohol and that she had taken some prescription medication . . . and she was following the recommended usage of that prescription."

Trooper Morris testified about his training and experience in relation to both alcohol and drugs and in discerning people that are under the influence of either. He testified that, by the time of this stop, he "had arrested approximately 230 [people for] driving under the influence" and had attended a "basic [driving under the influence] course at the academy." He testified that, in addition to his training related to alcohol usage, he had completed a separate training course and been certified as a drug recognition expert and had conducted more than 20 drug recognition expert evaluations.

Based on his observations of Kellogg and on his suspicion that she was under the influence of alcohol or drugs, he asked Kellogg to perform field sobriety tests. He administered the horizontal gaze nystagmus test, the walk-and-turn test, and the one-leg stand. In addition, he administered the "Romberg Balance" test and the finger-to-nose test.

Trooper Morris testified that Kellogg "showed lack of smooth pursuit" in the horizontal gaze nystagmus test. He testified that Kellogg had suffered an injury in one eye and that that eye was "deadened," which prevented him from assessing whether the pupils in both eyes were equal. He testified that he "did not see nystagmus at maximum deviation or onset of nystagmus prior to 45 degrees." He "did, however, see bloodshot glassy eyes in both eyes." He testified that Kellogg "did not display impairment on the horizontal gaze nystagmus test."

Trooper Morris testified that Kellogg "displayed impairment on the walk and turn" test. He indicated that "[i]n the first nine steps she missed the heel to toe four times and stepped off the line and raised her arms." He acknowledged that "national training guidelines" suggest that the walk-and-turn test may be inaccurate for "elderly individuals," acknowledged that the test becomes "nonconclusive" at age 65, and acknowledged that Kellogg was 61 years of age at the time of this traffic stop.

Trooper Morris testified that Kellogg "displayed impairment on the one leg stand by swaying while balancing, using her arms to balance and she put her foot down."

Trooper Morris testified that Kellogg displayed impairment on the "Romberg Balance" test. He testified that "she displayed eye tremors and had a one-inch sway from front to back and side to side."

Trooper Morris also testified that Kellogg "displayed impairment on the finger to nose test." He testified that she "missed the finger to nose and touched her nose with the pad of her finger" on several steps of the test and that "she did not wait for [Trooper Morris] to tell her to raise her arm."

At the conclusion of the field test, Trooper Morris had the opinion that Kellogg was impaired. He then asked her to perform a preliminary breath test, which result was ".000." Trooper Morris opined that as a result, the impairment he had observed was not due to alcohol.

Trooper Morris then requested Kellogg to provide a urine sample, but Kellogg refused. He then placed her under arrest.

Trooper Morris conducted an inventory search of the vehicle. During the search, he discovered "a little baggie of meth directly behind her driver's license in her wallet." The material in the baggie was sent to a laboratory for testing, and it tested positive for methamphetamine.

Kellogg was initially charged by information with possession of methamphetamine, driving under the influence of drugs, and refusal of a chemical test. She entered not guilty pleas to all charges. The State ultimately dismissed the latter two charges, leaving Kellogg charged only with possession of methamphetamine.

Kellogg moved to suppress "any and all evidence gained by means of a stop and search of [her] vehicle." In her motion, Kellogg challenged the initial stop and the subsequent search.

After a hearing on the motion to suppress, at which hearing the above testimony was adduced, the district court overruled Kellogg's motion. The court first found that the initial stop of Kellogg's vehicle was lawful, because Trooper Morris observed a traffic violation: speeding. The court found that Trooper Morris' observations were sufficient to give rise to a reasonable suspicion warranting the performance of field tests. The court held that Trooper Morris' observations, Kellogg's performance on the field tests, and Kellogg's refusal to submit to a chemical test were sufficient to provide probable cause to arrest Kellogg on suspicion of driving under the influence of drugs. The court held that the search performed by Trooper Morris was a lawful inventory search.

In analyzing Kellogg's motion to suppress, the district court noted that Neb. Rev. Stat. § 60-6,197 (Cum. Supp. 2014) required a person to be arrested prior to being required to submit to a chemical test such that refusal to submit to a test is a violation of the statute. As noted, the State subsequently dismissed the refusal charge.

Subsequent to the court's ruling on Kellogg's motion to suppress, the parties submitted the merits of the possession charge to the court in a stipulated bench trial. The court received a transcription of the motion to suppress hearing, the laboratory report indicating that the substance located during the inventory search was methamphetamine, and a stipulation of the

parties to submit the matter on the evidence adduced at the motion to suppress hearing and subject to Kellogg's objections therein.

The district court found Kellogg guilty of possession of methamphetamine. The court sentenced Kellogg to 2 years' probation. This appeal followed.

## III. ASSIGNMENTS OF ERROR

Kellogg has assigned two errors on appeal. First, she asserts that "[t]he district court erred in finding that Trooper Morris had reasonable articulable suspicion to expand the purpose of the traffic stop to a driving under the influence investigation." Second, she asserts that "[t]he district court erred in finding that Trooper Morris had probable cause to arrest [Kellogg] for driving under the influence . . . ."

## IV. STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review. Regarding historical facts, we review the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. *State v. Bol*, 288 Neb. 144, 846 N.W.2d 241 (2014).

## V. ANALYSIS

### 1. Expansion of Traffic Stop

Kellogg first asserts that "[t]he district court erred in finding that Trooper Morris had reasonable articulable suspicion to expand the purpose of the traffic stop to a driving under the influence investigation." She argues that Trooper Morris lacked reasonable suspicion to expand the stop, to continue to detain her, or to administer field sobriety tests. We find no merit to this assertion.

[1] Kellogg does not contest the propriety of the initial traffic stop. Nor could she reasonably do so, because the record shows that she was stopped for speeding. And a traffic violation, no matter how minor, creates probable cause to stop

the driver of the vehicle. *State v. Howard*, 282 Neb. 352, 803 N.W.2d 450 (2011).

[2] Once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. *Id*. This investigation may include asking the driver for an operator's license and registration, requesting that the driver sit in the patrol car, and asking the driver about the purpose and destination of his or her travel. *Id*. Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been stolen and whether there are outstanding warrants for any of its occupants. *Id*.

[3-6] To expand the scope of a traffic stop and continue to detain the motorist, an officer must have reasonable, articulable suspicion that a person in the vehicle is involved in criminal activity beyond that which initially justified the interference. See *id*. Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause. *Id*. Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances. *Id*. Reasonable suspicion must be determined on a case-by-case basis. *Id*.

In this case, the district court found that Trooper Morris had reasonable suspicion to detain Kellogg and administer field sobriety tests based on testimony that she was nervous, talkative, and confused; could not sit still; repeated herself; passed over her operator's license while looking for it; and had bloodshot eyes. We examine these factors mindful of the rule that when a determination is made to detain a person during a traffic stop, even where each factor considered independently is consistent with innocent activities, those same factors may amount to reasonable suspicion when considered collectively. See *State v. Howard, supra*.

As noted above, Trooper Morris testified that he had completed a "basic" driving under the influence course as part of his training and that he had also completed "a drug recognition expert course and [is] certified as a drug recognition

expert." He testified that at the time of his stop of Kellogg, he "had arrested approximately 230 [people for] driving under the influence" and had "done . . . approximately 21 or 22 [drug recognition expert] evaluations."

Trooper Morris testified that after he stopped Kellogg for speeding and made contact with her, he asked her to produce her operator's license, registration, and proof of insurance. He testified that she was not able to produce the documents. He testified that "[s]he appeared to be confused, overactive, and unable to concentrate on the task" of providing her operator's license and registration. Trooper Morris testified that he suspected that "there might be a possibility of some influence from a chemical substance."

Trooper Morris testified that he asked Kellogg if she had been drinking or had taken any drugs, and Kellogg indicated that she had taken some prescription medication "following the recommended usage of that prescription."

Trooper Morris testified that he believed Kellogg was under the influence of some substance based on "[t]he fact that she couldn't concentrate on any of the tasks, she couldn't sit still, [and] she had gone past her driver's license several times while she was looking for it." He explained that as Kellogg went through her wallet trying to locate her operator's license, he was able to visibly see the license but that Kellogg had "gone past it" and had not seen it and "stated that she must have left it at home." He also testified that he had to ask Kellogg for her registration and insurance card "a second time" before she was able to produce those items.

Trooper Morris testified that in his experience and training, that kind of behavior was indicative of someone's being under the influence.

Although some of these factors, when examined in isolation, do not weigh heavily in favor of a finding of reasonable suspicion that Kellogg was engaged in criminal activity, when viewed in their totality, they indicate that Trooper Morris had reasonable suspicion to detain her to determine whether she was under the influence of drugs or alcohol. Although Trooper Morris' observations could, to some extent, be characterized as indicia of nervousness, Kellogg's confusion,

hyperactivity, inability to concentrate, and inability to locate her operator's license and registration can be reasonably construed as more than typical nervousness at being stopped by law enforcement. Kellogg's assertion that there was not sufficient reasonable suspicion to expand the traffic stop is without merit.

We note that Trooper Morris testified that while he was administering the horizontal gaze nystagmus test, he observed "bloodshot glassy eyes in both eyes." He was not asked if he had observed Kellogg's eyes to be bloodshot prior to his administration of this field test. The district court included the fact that Kellogg had bloodshot eyes in its recitation of the factors that supported reasonable suspicion to continue detaining Kellogg and investigate the suspicion of driving under the influence. Because there is no evidence to indicate that Trooper Morris observed Kellogg's eyes to be bloodshot prior to his administering the field tests, we do not include it in our consideration of the evidence supporting Trooper Morris' reasonable suspicion.

## 2. PROBABLE CAUSE FOR ARREST

Kellogg also asserts that there was no probable cause for her arrest. We find no merit to this assertion.

[7] The Fourth Amendment mandates that an arrest be justified by probable cause to believe that a person has committed or is committing a crime. *State v. Scheffert*, 279 Neb. 479, 778 N.W.2d 733 (2010). Therefore, in order to arrest Kellogg for driving under the influence, Trooper Morris needed probable cause to believe Kellogg had been driving under the influence of drugs or alcohol. See *id*.

[8,9] Probable cause is a flexible, commonsense standard that depends on the totality of the circumstances. *State v. Matit*, 288 Neb. 163, 846 N.W.2d 232 (2014). We determine whether probable cause existed under an objective standard of reasonableness, given the known facts and circumstances. *Id*.

In this case, the district court concluded that the State had demonstrated that Trooper Morris had probable cause to arrest Kellogg for driving under the influence. The court noted that "Trooper Morris testified that after performing a

series of field sobriety tests that, in his opinion, [Kellogg] was impaired by either drugs or alcohol." The court noted that a preliminary breath test registered negative to alcohol and that "Trooper Morris testified that, after considering the negative result of the [preliminary breath test], the impairment he was observing was not due to alcohol." The court also noted that Trooper Morris requested Kellogg to provide a urine sample, but she refused to do so. Based on the totality of the circumstances, including Trooper Morris' observations of Kellogg prior to the field sobriety tests and during performance of the field tests, the observation of bloodshot eyes, and her refusal to provide a urine sample, the district court found probable cause to support the arrest for driving under the influence.

On appeal, Kellogg again argues that her behavior prior to the field sobriety tests was merely indicative of nervousness and alone cannot be enough to support a finding of probable cause. She argues that evidence that her eyes appeared bloodshot is not significant because there was no "evidence that would indicate how [her] eye normally looks to be able to determine whether it was significant that her eye was bloodshot or glassy." Brief for appellant at 26. She argues that various portions of her performance on the field sobriety tests were not consistent with impairment, even if other portions were. She argues that some of the observations Trooper Morris testified about in court were not contained in his written report. She argues that her age, 61 at the time of the stop, should be considered a factor in assessing her performance on some of the field tests.

Despite Kellogg's assertions regarding individual aspects of Trooper Morris' observations and Kellogg's performance on the field sobriety tests, the totality of the circumstances demonstrates that Trooper Morris had sufficient probable cause to make an arrest for driving under the influence. As noted above, although some of her behaviors could be considered consistent with nervousness, it is reasonable to conclude that they went beyond mere nervousness. Although the observation of bloodshot eyes alone would not be sufficient to constitute probable cause, it is a relevant factor to the totality of the circumstances

evaluation. Similarly, regardless of whether certain specific aspects of various field tests were inconsistent with impairment, the overall opinion of impairment based on the tests is a part of the totality consideration.

Trooper Morris testified that every field sobriety test besides the horizontal gaze nystagmus test indicated impairment. With respect to the horizontal gaze nystagmus test, Trooper Morris testified that an injury Kellogg had suffered to one eye limited the usefulness of the test, but also testified that he did not observe nystagmus. He did, however, observe Kellogg's eyes to be bloodshot and glassy. With respect to the walk-and-turn test, he testified that Kellogg's performance indicated impairment, even though there was not a "real" line for Kellogg to use and even though she was 61 years of age at the time. With respect to the one-leg stand, he testified that Kellogg's performance indicated impairment. With respect to the "Romberg Balance" test, he testified that Kellogg's performance indicated impairment. With respect to the finger-to-nose test, he testified that Kellogg's performance indicated impairment.

Trooper Morris testified that Kellogg did not provide him with any reason that she would be unable to adequately perform any of the field sobriety tests. He testified that she indicated that she understood what was being asked of her for each of the field tests. And he testified that his conclusion based on her performance on the field tests was that she was impaired.

Trooper Morris testified that the fact that Kellogg's preliminary breath test showed a negative result for alcohol suggested to him that the impairment he was observing was related to drugs and not alcohol. And he testified about his specific training with respect to drug recognition.

Based on the totality of the circumstances, we conclude that a reasonably cautious person would believe that Kellogg was under the influence of some substance. Under an objective standard of reasonableness, we find that Trooper Morris had probable cause to arrest Kellogg for driving under the influence and that the district court did not err in so concluding. This assignment of error is without merit.

## VI. CONCLUSION

We find no merit to Kellogg's assertions that Trooper Morris lacked reasonable suspicion to expand the detention beyond a traffic stop for speeding and to investigate suspicion that she was under the influence of drugs or alcohol. We find no merit to Kellogg's assertions that Trooper Morris lacked probable cause to arrest her for driving under the influence. We affirm the decision of the district court.

Affirmed.

Irwin, Judge, dissenting.

I respectfully disagree with the majority's conclusion that the evidence in this case supports a finding, despite this being a de novo review of questions of law, that the law enforcement officer had reasonable, articulable suspicion to expand the scope of the initial stop beyond its original purpose. The evidence indicates that his observations amounted to observations merely of nervousness, which is not sufficient to support a finding of reasonable, articulable suspicion. I would reverse.

Once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. *State v. Howard*, 282 Neb. 352, 803 N.W.2d 450 (2011). The investigation permitted by the traffic stop itself may include gathering information related to the traffic stop and determining whether the vehicle is stolen or the driver is the subject of outstanding warrants. See *id*.

To expand the scope of the stop and continue to detain the motorist to pursue investigating other possibilities, such as driving under the influence, an officer must have reasonable, articulable suspicion that a person in the vehicle is involved in criminal activity beyond that which initially justified the interference. See *id*.

To demonstrate reasonable, articulable suspicion, there must be some objective justification for detention, something more than an inchoate and unparticularized hunch. *Id*. Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances. *Id*. Reasonable suspicion must be determined

on a case-by-case basis. *Id*. Determinations of reasonable suspicion are reviewed de novo. *State v. Lee*, 265 Neb. 663, 658 N.W.2d 669 (2003).

Although a motorist's nervousness is an appropriate factor for consideration within the totality of the circumstances of a prolonged traffic stop, *its presence is of limited significance generally*. *State v. Louthan*, 275 Neb. 101, 744 N.W.2d 454 (2008). The Nebraska Supreme Court has specifically held that standing alone, a description of a motorist's nervousness would not support a determination of reasonable suspicion. See *id*. In this case, Trooper Morris' basis for reasonable suspicion was just that—a description of Kellogg's nervousness, standing alone.

In this case, the factors upon which the district court based its conclusion that there was reasonable suspicion to detain Kellogg and administer field sobriety tests were testimony that she was nervous, talkative, and confused; could not sit still; repeated herself; passed over her operator's license while looking for it; and had bloodshot eyes.

Trooper Morris testified that he believed Kellogg was under the influence of some substance based on "[t]he fact that she couldn't concentrate on any of the tasks, she couldn't sit still, [and] she had gone past her driver's license several times while she was looking for it." He explained that as Kellogg went through her wallet trying to locate her operator's license, he was able to visibly see the license but that Kellogg had "gone past it" and had not seen it and "stated that she must have left it at home." He also testified that he had to ask Kellogg for her registration and insurance card "a second time" before she was able to produce those items.

According to Trooper Morris, based upon this demeanor, he had suspicions that she was under the influence of a chemical substance. He testified that he did not detect the odor of alcohol or drugs and that Kellogg's speech was not slurred, and he did not testify to any other objective indications that would have suggested that Kellogg was under the influence.

Trooper Morris testified that in his experience and training, that kind of behavior was indicative of someone's being under the influence. He did not, however, testify about why these

actions—which are all consistent with mere nervousness—suggest someone's being under the influence. Morris' testimony about his training and background did not include any explanation of why or how any of these observations about Kellogg's demeanor suggested that she was under the influence of some substance, rather than merely nervous at being stopped by law enforcement.

I would conclude that these factors, when viewed in their totality, are insufficient to indicate that Trooper Morris had reasonable suspicion to detain Kellogg to determine whether she was under the influence of drugs or alcohol. Trooper Morris' observations amount only to observing indicia of nervousness. Kellogg's inability to locate her operator's license and registration or concentrate on the task of doing so is reasonably construed as nervousness at being stopped by law enforcement. Trooper Morris testified that he observed no odor of alcohol or drugs and that he observed nothing about her driving besides speeding that would warrant stopping her. Kellogg's assertion that there was not sufficient reasonable suspicion to expand the traffic stop is with merit.

Although Trooper Morris testified that he is a drug recognition expert and that he had performed approximately 21 or 22 drug recognition expert evaluations, he did not testify to any nexus between Kellogg's nervousness and a reasonable suspicion of her being under the influence of drugs. When asked why he had reason to believe that Kellogg was under the influence, he merely pointed to her inability to concentrate, sit still, and locate her driver's license without going past it in her wallet.

As noted by the majority, the evidence did not support the district court's inclusion of Trooper Morris' observation of bloodshot eyes, because the testimony does not indicate that Trooper Morris made that observation prior to administering the field tests.

I would find that the district court erred in concluding that Trooper Morris had reasonable, articulable suspicion to expand the initial stop beyond its purposes as a traffic stop for speeding. I would reverse the district court's conclusion to the contrary.